# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| SISTERREACH, INC.; MIDWEST ACCESS COALITION, INC., | ) |
| | ) |
| | )  Case No.: |
| Plaintiffs | ) |
| | ) |
| v. | )  **COMPLAINT** |
| | ) |
| JONATHAN SKRMETTI, in his official capacity as Attorney General of Tennessee; STEVEN FINNEY, in his official capacity as District Attorney General for District One; BARRY STAUBUS, in his official capacity as District Attorney General for District Two; DAN ARMSTRONG, in his official capacity as District Attorney General for District Three; JIMMY DUNN, in his official capacity as District Attorney General for District Four; RYAN DESMOND, in his official capacity as District Attorney General for District Five; CHARME ALLEN, in her official capacity as District Attorney General for District Six; DAVE CLARK, in his official capacity as District Attorney General for District Seven; JARED EFFLER, in his official capacity as District Attorney General for District Eight; RUSSELL JOHNSON, in his official capacity as District Attorney General for District Nine; SHARI TAYLOE, in her official capacity as District Attorney General for District Ten; COTY WAMP, in her official capacity as District Attorney General for District Eleven; COURTNEY LYNCH, in her official capacity as District Attorney General for District Twelve; BRYANT DUNAWAY, in his official capacity as District Attorney General for District Thirteen; CRAIG NORTHCOTT in his official capacity as District Attorney General for District Fourteen; JASON LAWSON, in his official capacity as District Attorney General for District Fifteen; JENNINGS JONES, in his official capacity as District Attorney General for District Sixteen; ROBERT CARTER, in his official capacity as District Attorney General for District Seventeen; RAY WHITLEY, in his official capacity as District Attorney General for District Eighteen; ROBERT NASH, in his official capacity as District Attorney General for District Nineteen; GLENN | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

FUNK, in his official capacity as District Attorney )
General for District Twenty; STACEY EDMONSON, )
in her official capacity as District Attorney General for )
District Twenty-One; BRENT COOPER, in his official )
capacity as District Attorney General for District )
Twenty-Two; RAY CROUCH, in his official capacity )
as District Attorney General for District Twenty-Three; )
NEIL THOMPSON, in his official capacity as District )
Attorney General for District Twenty-Four; MARK )
DAVIDSON, in his official capacity as District )
Attorney General for District Twenty-Five; JODY )
PICKENS, in his official capacity as District Attorney )
General for District Twenty-Six; COLIN JOHNSON, in )
his official capacity as District Attorney General for )
District Twenty-Seven; FREDERICK AGEE, in his )
official capacity as District Attorney General for )
District Twenty-Eight; DANNY GOODMAN, in his )
official capacity as District Attorney General for )
District Twenty-Nine; STEVE MULROY, in his )
official capacity as District Attorney General for )
District Thirty; CHRIS STANFORD, in his official )
capacity as District Attorney General for District )
Thirty-One; HANS SCHWENDIMANN, in his official )
capacity as District Attorney General for District )
Thirty-Two, )
)
                        Defendants.

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the

above-named Defendants and their employees, agents, and successors in office, and in support

thereof, allege the following:

## INTRODUCTION

1.    Indifferent to the extraordinary impact of denying a young person[1] access to legal

abortion care, S.B. 1971(1)(a), Gen. Assemb., Sec. Reg. Sess. (Tn. 2023) ("SB 1971") seeks to

criminalize a wide range of actors, including Plaintiffs, for helping young people leave Tennessee

to obtain legal abortions in other states without written, notarized parental consent to do so.

---

[1] This complaint uses "young person" as shorthand for an unemancipated minor under the age of
eighteen.

2.     In incendiary fashion, SB 1971 brands non-profit groups like Plaintiffs as traffickers, when in fact they are longstanding, caring allies who serve young people to express respect for and solidarity with them.

3.     Contrary to fearmongering over youth and abortion, most young people involve a parent in decisions about whether to continue a pregnancy. SB 1971 would punish young people in Tennessee who have confided in a parent but cannot furnish the written, notarized parental consent. SB 1971 would also punish young people in Tennessee with absent, incapacitated, abusive, or unsupportive parents; young people in state custody; and other system-involved youth.

4.     SB 1971 is so unclear that those dedicated to helping young people in Tennessee secure legal abortion care cannot determine when their support would become a crime. As such, SB 1971 gives prosecutors unbridled discretion to target anyone whom they disfavor. What is more, SB 1971 stifles helpers' protected expression *because* the expression concerns legal abortion as opposed to any other legal healthcare, and because the speech concerns expanding rather than restricting legal abortion.

5.     Consequently, Plaintiffs, both of whom would continue helping young people in Tennessee obtain legal abortion care in other states but for SB 1971, seek declaratory and injunctive relief from SB 1971's vague, overbroad, and otherwise unconstitutional provisions.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343. This is an action to enforce civil and constitutional rights pursuant to 42 U.S.C. § 1983 and the United States Constitution.

7.    This Court has authority to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343, Federal Rules of Civil Procedure 57 and 65, and the general legal and equitable powers of the Court.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because certain Defendants, who are government officers sued in their official capacities, perform their official duties in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and Plaintiff SisterReach is located in Memphis, Tennessee.

## PARTIES

### I.    Plaintiffs

9.    SisterReach, Inc. ("SisterReach") is a Memphis-based non-profit organization with a mission to empower the people it serves to lead healthy lives, raise healthy families, and live in healthy and sustainable communities. It supports the reproductive autonomy of women and teens of color, poor and rural women, LGBTQIA+ people, and their families through the framework of reproductive justice. Reproductive and sexual justice organizations operate with the core principles that people have the human rights to decide if and when they will have a baby and the conditions under which they will give birth, adopt, or parent; to decide their option for preventing or ending a pregnancy; to parent the children they already have in safe environments and healthy communities without fear of violence from individuals or the state; to bodily autonomy free from all forms of reproductive oppression; to express their sexuality and spirituality without violence or shame; and to a quality of life that is sustainable before, during, and beyond their ability to give birth or parent. SisterReach is the only reproductive justice organization in Tennessee. Among other programs, SisterReach operates the Tennessee Reproductive Access Fund, which pays for

legal abortion care for Tennesseans so they can put their own resources towards the other costs of obtaining that care, including transportation, lodging, meals, and childcare.

10.    SisterReach provides such support to young people in Tennessee seeking legal abortions in other states regardless of whether they have supportive parents. SisterReach plans to stop that help on July 1, 2024, unless this Court declares or orders that SB 1971 cannot be enforced against it.

11.    Through this help, SisterReach conveys that young people in Tennessee deserve to make deeply personal decisions for themselves, including whether to continue a pregnancy and parent a child, and be unequivocally supported in doing so.

12.    SisterReach belongs to a coalition and seeks to achieve collective power through education, service, advocacy, volunteer mobilization, and allied partnerships.

13.    SisterReach sues on its own behalf and on behalf of its staff and volunteers.

14.    Midwest Access Coalition, Inc. ("Midwest Access Coalition" or "MAC") is a nonprofit organization based in Illinois working towards a world where all people can access safe, free, and legal abortion care wherever they live. To that end, MAC provides people information about and referrals for legal abortion care. MAC also helps people obtain legal abortion care by coordinating and funding their transportation, lodging, meals, and childcare.[2]

---

[2] Organizations that provide such support are often referred to as "practical support organizations."

15.     MAC provides such support to young people in Tennessee seeking legal abortions in other states regardless of whether they have parental consent. MAC plans to stop that support on July 1, 2024, unless this Court declares or orders that SB 1971 cannot be enforced against it.

16.     Through these activities, MAC expresses that young people in Tennessee are worthy of respect and community. Through these activities, MAC conveys protest and defiance of politicians' attempts to impose pregnancy, childbirth, and parenthood on young people and to stigmatize young people's decisions to reject or delay those things.

17.     MAC belongs to a coalition and seeks to achieve collective power through education, service, advocacy, volunteer mobilization, and allied partnerships.

18.     MAC sues on its own behalf and on behalf of its staff and volunteers.

## II.     Defendants

19.     Defendant Jonathan Skrmetti is the Attorney General of Tennessee. As Attorney General, Defendant Skrmetti is responsible for defending Tennessee laws against constitutional challenges. *See* Tenn. Code Ann. § 8-6-109(b)(9). He is also empowered to petition the Tennessee Supreme Court to appoint a district attorney general pro tem to enforce SB 1971 where an elected district attorney general declines to enforce the statute. *See* Tenn. Code Ann. § 8-7-106(a)(2). And he has expressed a willingness to engage in criminal, civil, or administrative investigations or proceedings against helpers of abortion patients.[3] "Enjoining a statewide official . . . based on his

---

[3] *See* Anita Wadhwani, *Tennessee AG asserts right to out-of-state abortion, transgender care medical records*, Tennessee Lookout (July 18, 2023), https://tennesseelookout.com/2023/07/18/tennessee-ag-asserts-right-to-out-of-state-abortion-transgender-care-medical-records/ (joining eighteen other attorneys general in opposing a Department of Health and Human Services rule that would prohibit uses and disclosures of

obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015). Defendant Jonathan Skrmetti is sued in his official capacity and may be served with process at John Sevier Building, 500 Dr. Martin L. King Jr. Blvd., Nashville, TN 37243.

20.     Defendant Steven Finney is the District Attorney General for District One, encompassing Carter, Johnson, Unicoi, and Washington Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103 subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Finney is sued in his official capacity and may be served with process at Jonesborough Criminal Office, P.O. Box 38, 115 East Jackson Blvd., Jonesborough, TN, 37659.

21.     Defendant Barry Staubus is the District Attorney General for District Two, which consists of Sullivan County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Staubus is sued in his official

---

protected health information for criminal, civil, or administrative proceedings against individuals and entities "seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it is provided") (citing HIPAA Privacy Rule To Support Reproductive Health Care Privacy, 88 Fed. Reg. 23506 (proposed April 17, 2023) (to be codified at 45 C.F.R. pts. 160, 164)).

capacity and may be served with process at Sullivan County Office of the District Attorney General, 140 Blountville Bypass, P.O. Box 526, Blountville, TN 37617.

22.     Defendant Dan Armstrong is the District Attorney General for District Three, encompassing Greene, Hamblen, Hancock, and Hawkins Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Armstrong is sued in his official capacity and may be served with process at Greeneville Criminal Office, 124 Austin St., Suite 3, Greeneville, TN, 37745.

23.     Defendant Jimmy Dunn is the District Attorney General for District Four, encompassing Cocke, Grainger, Jefferson, and Sevier Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Dunn is sued in his official capacity and may be served with process at Sevierville Criminal Office, 125 Court Ave., Suite 301-E, Sevierville, TN, 37862.

24.     Defendant Ryan Desmond is the District Attorney General for District Five, which consists of Blount County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d *831*, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state

criminal statutes . . .") (emphasis added). Defendant Desmond is sued in his official capacity and may be served with process at Maryville Criminal Office, 942 E. Lamar Alexander Parkway, Maryville, TN, 37804.

25.     Defendant Charme Allen is the District Attorney General for District Six, which consists of Knox County, where she is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Allen is sued in her official capacity and may be served with process at City County Building, 400 Main Street, Suite 168, Knoxville, TN, 37902.

26.     Defendant Dave Clark is the District Attorney General for District Seven, which consists of Anderson County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Clark is sued in his official capacity and may be served with process at Office of District Attorney General, 101 S. Main St., Suite 300, Clinton, TN, 37716.

27.     Defendant Jared Effler is the District Attorney General for District Eight, encompassing Campbell, Claiborne, Fentress, Scott, and Union Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in

the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Effler is sued in his official capacity and may be served with process at Campbell County Criminal Office, P.O. Box 323, 610 Main St., Jacksboro, TN, 37757.

28.     Defendant Russell Johnson is the District Attorney General for District Nine, encompassing Loudon, Meigs, Morgan, and Roane Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Johnson is sued in his official capacity and may be served with process at Kingston Criminal Office, 1008 Bradford Way, Suite 100, Kingston, TN, 37763.

29.     Defendant Shari Tayloe is the District Attorney General for District Ten, encompassing Bradley, McMinn, Monroe, and Polk Counties, where she is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Tayloe is sued in her official capacity and may be served with process at Cleveland Criminal Office, P.O. Box 1351, 3855 N. Ocoee St., 3rd Floor, Cleveland, TN, 37364.

30.     Defendant Coty Wamp is the District Attorney General for District Eleven, which consists of Hamilton County, where she is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103,

subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Wamp is sued in her official capacity and may be served with process at Chattanooga Criminal Office, P600 Market St., Suite 310, Chattanooga, TN, 37402.

31.     Defendant Courtney Lynch is the District Attorney General for District Twelve, encompassing Bledsoe, Franklin, Grundy, Marion, Rhea, and Sequatchie Counties, where she is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Lynch is sued in her official capacity and may be served with process at Dayton Criminal Office, 7794 Rhea County Highway, Suite 102, TN, 37321.

32.     Defendant Bryant Dunaway is the District Attorney General for District Thirteen, encompassing Clay, Cumberland, DeKalb, Overton, Pickett, Putnam, and White Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Dunaway is sued in his official capacity and may be served with process at Cookeville Criminal Office, 1289 South Walnut Avenue, Cookeville, TN, 38501.

33.     Defendant Craig Northcott is the District Attorney General for District Fourteen, which consists of Coffee County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin

a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Northcott is sued in his official capacity and may be served with process at Manchester Criminal Office, P.O. Box 147, 409 Madison ST., Manchester, TN, 37349.

34.     Defendant Jason Lawson is the District Attorney General for District Fifteen, encompassing Jackson, Macon, Smith, Trousdale, and Wilson Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Lawson is sued in his official capacity and may be served with process at Hartsville Criminal Office, 203 Greentop St., Hartsville, TN, 37074.

35.     Defendant Jennings Jones is the District Attorney General for District Sixteen, encompassing Cannon and Rutherford Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Jones is sued in his official capacity and may be served with process at Murfreesboro Criminal Office, P320 West Main Street, Suite 100, Murfreesboro, TN, 37130.

36.     Defendant Robert Carter is the District Attorney General for District Seventeen, encompassing Bedford, Lincoln, Marshall, and Moore Counties, where he is "sworn to enforce"

SB 1971. *See, e.g., Friends* of *Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Carter is sued in his official capacity and may be served with process at Fayetteville Criminal Office, 1798 Wilson Parkway, Fayetteville, TN, 37334.

37.    Defendant Ray Whitley is the District Attorney General for District Eighteen, which consists of Sumner County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Whitley is sued in his official capacity and may be served with process at Gallatin Criminal Office, 113 West Main St., 3rd Floor, Gallatin, TN, 37066.

38.    Defendant Robert Nash is the District Attorney General for District Nineteen, encompassing Montgomery and Robertson Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Nash is sued in his official capacity and may be served with process at State of Tennessee District Attorneys General Office, 19th Judicial District, 200 Commerce St., Suite A, Clarksville, TN, 37040.

39.     Defendant Glenn Funk is the District Attorney General for District Twenty, which consists of Davidson County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Funk is sued in his official capacity and may be served with process at Davidson County District Attorney-Criminal Division, 222 2nd Ave N #500, Nashville, TN, 37201.

40.     Defendant Stacey Edmonson is the District Attorney General for District Twenty-One, which consists of Williamson County, where she is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Edmonson is sued in her official capacity and may be served with process at Franklin Criminal Office, 421 Main St., Suite 102, Franklin, TN, 37064.

41.     Defendant Brent Cooper is the District Attorney General for District Twenty-Two, encompassing Giles, Lawrence, Maury, and Wayne Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Cooper

is sued in his official capacity and may be served with process at Lawrenceburg Criminal Office, P.O. Box 459, 32 Public Square, Lawrenceburg, TN, 38464.

42.     Defendant Ray Crouch is the District Attorney General for District Twenty-Three, encompassing Cheatham, Dickson, Houston, Humphreys, and Stewart Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Crouch is sued in his official capacity and may be served with process at Carlotte Criminal Office, P.O. Box 580, 604 Spring St., Lower Level, Charlotte, TN, 37036.

43.     Defendant Neil Thompson is the District Attorney General for District Twenty-Four, encompassing Benton, Carroll, Decatur, Hardin, and Henry Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Thompson is sued in his official capacity and may be served with process at Carroll County Criminal Office, P.O. Box 627, 100 Court Square, Huntingdon, TN, 38344.

44.     Defendant Mark Davidson is the District Attorney General for District Twenty-Five, encompassing Fayette, Hardeman, Lauderdale, McNairy, and Tipton Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall*

prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Davidson is sued in his official capacity and may be served with process at Ripley Criminal Office, P121 North Main St., Ripley, TN, 38063.

45.     Defendant Jody Pickens is the District Attorney General for District Twenty-Six, encompassing Chester, Henderson, and Madison Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Pickens is sued in his official capacity and may be served with process at Jackson Criminal Office, P.O. Box 2825, 225 Martin Luther King Jr. Drive, Suite 330, Jackson, TN, 38302.

46.     Defendant Colin Johnson is the District Attorney General for District Twenty-Seven, encompassing Obion and Weakley Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of* Georges*, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Johnson is sued in his official capacity and may be served with process at Dresden Criminal Office, 119 North Poplar St., Dresden, TN, 38225.

47.     Defendant Frederick Agee is the District Attorney General for District Twenty-Eight, encompassing Crockett, Gibson, and Haywood Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law);

Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Agee is sued in his official capacity and may be served with process at Trenton Criminal Office, P.O. Box 145, 113-B West Eaton St., Trenton, TN, 38382.

48.     Defendant Danny Goodman is the District Attorney General for District Twenty-Nine, encompassing Dyer and Lake Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Goodman is sued in his official capacity and may be served with process at Dyersburg Criminal Office, P.O. Drawer E, 115 East Market St., Dyersburg, TN, 38025.

49.     Defendant Steve Mulroy is the District Attorney General for District Thirty, which consists of Shelby County, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Mulroy is sued in his official capacity and may be served with process at Shelby County District Attorney Office, 201 Poplar Avenue, 11th Floor, Memphis, TN, 38103.

50.     Defendant Chris Stanford is the District Attorney General for District Thirty-One, encompassing Van Buren and Warren Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing

suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added).  Defendant Stanford is sued in his official capacity and may be served with process at McMinnville Criminal Office, P.O. Box 510, 131 East Main St., McMinnville, TN, 37110.

51.     Defendant Hans Schwendimann is the District Attorney General for District Thirty-Two, encompassing Hickman, Lewis, and Perry Counties, where he is "sworn to enforce" SB 1971. *See, e.g., Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 848 (W.D. Tenn. 2023) (authorizing suit to enjoin a District Attorney General from enforcing a state criminal law); Tenn. Code Ann. § 8-7-103, subdiv. (1) ("Each district attorney general *shall* prosecute in the courts of the district *all* violations of the state criminal statutes . . .") (emphasis added). Defendant Schwendimann is sued in his official capacity and may be served with process at Centerville Criminal Office, P.O. Box 223, 117 Church St., Centerville, TN, 37033.

## FACTUAL ALLEGATIONS

## I.     Abortion is Very Common and Extremely Safe.

52.     Abortion is a very common medical intervention. In 2021, the most recent year for which national data is available, at least 625,978 abortions occurred in the United States.[4]

53.     Legal abortion is much safer, and less burdensome, than continuing a pregnancy through childbirth. Even an uncomplicated pregnancy profoundly challenges a person's physiology and major organs: it dramatically increases their blood volume, forcing their heart to work twice as hard; strains their lungs; compresses the organs in their abdomen; and elevates their

---

[4] Abortion Surveillance - United States, 2021. Table 1. Morbidity and Mortality Weekly Report, Vol 72(No. SS-9):1–30. Centers for Disease Control and Prevention, November 24, 2023.

risks for blood clots and infection. And every pregnancy-related complication, including severe nausea and vomiting, gestational diabetes, and preeclampsia, is more common among patients giving birth than among those ending a pregnancy.[5]

54.     Labor and delivery present their own medical risks and burdens. Labor can last anywhere from hours to days, be extremely painful, involve tearing leading to incontinence and sexual dysfunction, be mentally taxing and even traumatic, entail profuse bleeding, and end in a caesarean section, which is a major abdominal surgery.[6]

55.     Notably, the risk of death associated with childbirth is twelve times higher than that associated with abortion.[7] The United States has a significantly higher rate of maternal mortality than other developed nations.[8] In 2022, 817 women and girls died of maternal causes.[9] And Black women and girls die from maternal causes at a substantially higher rate than White women and girls. In 2022, the maternal mortality rate for Black women and girls was approximately 2.5 times

---

[5] Nat'l Acads. of Scis., Eng'g, and Med., *The Safety and Quality of Abortion Care in the United States* 1-16 (2018), https://doi.org/10.17226/24950.

[6] *See* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216-17 (2012); Laura Santhanam, *It's Time to Recognize the Damage of Childbirth, Doctors and Mothers Say*, PBS New Hour, https://www.pbs.org/newshour/health/broken-tired-and-ashamed-how-health-care-fails-new-moms.

[7] Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States*  75 tbl. 2-4 (2018).

[8] Donna L. Hoyert, *Maternal Mortality Rates in the United States, 2022*, CENT. DIS. CONTROL PREV. (2024), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2022/maternal-mortality-rates-2022.pdf.

[9] *Id.* Although most people with the capacity to become pregnant are women and girls, some transgender men, boys, and nonbinary people also have the capacity to become pregnant. *See, e.g.*, Heidi Moseson *et al.*, *Development of an Affirming and Customizable Electronic Survey of Sexual and Reproductive Health Experiences for Transgender and Gender Nonbinary People*, 15(5) PLoS ONE: e0232154, at 2–3 (2020), https://doi.org/10.1371/journal.pone.0232154; Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 OBSTETRIC MED. 4, 4–6 (2016).

the rate for White women and girls.[10] Stunningly, Tennessee has the third highest maternal mortality rate in the country.[11]

56.     Moreover, infants born to young people are more likely to die in their first year of life than infants born to women over twenty.[12] Specifically, compared with women over twenty, teenagers have higher rates of preterm birth, low birthweight, and neonatal and infant mortality.[13] Mortality rates are highest for infants of young people who are Black.[14]

57.     Adolescent mothers are twice as likely as their adult counterparts to suffer from postpartum depression, which is associated with low self-esteem, difficulty developing parenting skills, delayed infant development, substance abuse, suicidal ideation, and mental illness beyond the postpartum period.[15] Further, unlike adults, young people who become parents must also contend with stigma for "violat[ing] age norms for parenting."[16]

---

[10] *Id.*

[11] NCHS, *Maternal deaths and mortality rates: Each state, the District of Columbia, United States, 2018-2021*, CENT. DIS. CONTROL PREV., https://www.cdc.gov/nchs/maternal-mortality/mmr-2018-2021-state-data.pdf.

[12]  Ashley M Woodall & Anne K. Driscoll, *Racial and Ethnic Differences in Mortality Rate of Infants Born to Teen Mothers: United States, 2017–2018*, CENT. DIS. CONTROL PREV. (2020), https://www.cdc.gov/nchs/products/databriefs/db371.htm.

[13] *Id.*

[14] *Id.*

[15] Sigrid Ladores & Jessica Corcoran, *Investigating Postpartum Depression in the Adolescent Mother Using 3 Potential Qualitative Approaches*, 13 CLIN. MED. INSIGHTS PEDIATR. 1179556519884042 (2019), https://doi.org/10.1177/11795565198840;  Robyn Birkeland, J. Kevin Thompson & Vicky Phares, *Adolescent Motherhood and Postpartum Depression*, 34 J. CLIN. CHILD ADOLESC. PSYCHOL. 292 (2005), https://doi.org/10.1207/s15374424jccp3402_8 .

[16] Lee Smith Battle, *Walking on Eggshells: An Update on the Stigmatizing of Teen Mothers*, NURSING CENTER (2020), https://www.nursingcenter.com/wkhlrp/Handlers/articleContent.pdf?key=pdf_00005721-202011000-00002.

58.     In contrast to continuing a pregnancy through childbirth, abortion is one of the safest medical interventions provided in the United States today. Complications associated with abortion are exceedingly rare: nationwide, fewer than one-quarter (0.23%) of 1% of all abortion patients experience a complication that requires hospitalization, surgery, or a blood transfusion.[17]

59.     Three methods of abortion are commonly used in the United States: medication abortion, aspiration abortion, and D&E abortion. Medication abortion involves providing medications that end a pregnancy and cause the uterus to expel its contents. This method may be used from the start of a pregnancy through eleven weeks gestation, as measured from the first day of a patient's last menstrual period ("lmp"). Aspiration abortion involves using suction to empty the contents of the uterus. This method is typically used from six weeks lmp through fourteen to sixteen weeks lmp. D&E abortion involves using suction and medical instruments to empty the contents of the uterus. This method is generally used beginning at fourteen to sixteen weeks lmp.

60.     Although abortion is extremely safe throughout pregnancy, its complexity, duration, costs, and medical risks increase with gestational age. To illustrate, the average costs of a medication abortion, first-trimester aspiration abortion, and second-trimester abortion are $568, $625, and between $715 and $2,000, respectively.[18]

61.     Further, each day that someone remains pregnant against their will can be agonizing, particularly if the pregnancy resulted from abuse.

---

[17] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 OBSTET. GYNECOL. 175 (2015), https://journals.lww.com/greenjournal/fulltext/2015/01000/incidence_of_emergency_department_visits_and.29.aspx (last visited Jun 21, 2024).

[18] Rosalyn Schroeder et al., *Trends in Abortion Care in the United States, 2017-2021*, ADV. NEW STAND. REPROD. HEALTH ANSIRH 14, https://www.ansirh.org/sites/default/files/2022-06/Trends%20in%20Abortion%20Care%20in%20the%20United%20States%2C%202017-2021.pdf.; *How much does an abortion cost?* Planned Parenthood, https://www.plannedparenthood.org/blog/how-much-does-an-abortion-cost.

II.   **Young People in Tennessee Face Daunting Challenges to Obtaining Legal Abortion Care and Avoiding Compelled Pregnancy, Childbirth, and Parenthood—Especially After *Dobbs***

62.   Tennessee has the thirteenth-highest poverty rate (13.28%) in the country and twelfth-highest child poverty rate (17.34%) in the country.[19]

63.   Young people in Tennessee have always needed abortions. In fact, a fiscal analysis of SB 1971 found that between 2019 and 2020, before Tennessee's abortion ban took effect, over 500 abortions were provided to young people in the state.[20]

64.   And even before Tennessee's abortion ban took effect, young people relied disproportionately on organizations like SisterReach and MAC to secure resources needed to end an unwanted pregnancy. These included funding for the abortion itself, transportation to the abortion facility, and funding for childcare during the visit to the facility. These needs were especially acute among young people belonging to communities of color, rural communities, and LGBTQ+ communities.

65.   What is more, Tennessee required young people to secure the written consent of a parent or guardian to obtain an abortion. Tenn. Code Ann. § 37-10-303(a). Most young people involved a parent in their decision of whether to continue a pregnancy.[21] But some young people could not secure that consent or had good reasons not to involve a parent or guardian in the

---

[19] *Poverty in the United States: Explore the Map*, CENTER FOR AMERICAN PROGRESS (Sep. 19, 2022), https://www.americanprogress.org/data-view/poverty-data/poverty-data-map-tool/ (last visited Jun 21, 2024).

[20] Fiscal Note – H.B. 1895 & S.B. 1971, Tennessee General Assembly Fiscal Review Committee (Feb. 4, 2024), available at https://www.capitol.tn.gov/Bills/113/Fiscal/HB1895.pdf.

[21] In a review of 1,500 minors seeking abortion care, 61% consulted at least one parent. For minors aged 15 and below, 91% consulted at least one parent when deciding to obtain an abortion. Stanley K. Henshaw et. al., *Parental Involvement in Minors' Abortion Decisions*, Family Planning Perspectives 24(5): 196-207, 213 (1992).

decision. Among other challenges, these young people did not know whether or where their parents were living, had parents who were incarcerated or battling substance abuse issues that prevented them from adequately caring for their children, faced abusive or neglectful parents, lived in foster care, or were in juvenile detention.[22] These young people could, in theory, petition a court for permission to bypass the parental consent requirement. Tenn. Code Ann. § 37-10-303(b). Davidson County Juvenile Court Judge Sheila Calloway recalls deciding at least ten such petitions a year until Tennessee's abortion ban took effect in 2022.[23] Further, she recalls that young people who sought a bypass were not always able to make the trip to her, potentially condemning them to carry to term and become parents against their will.[24]

66.     In 2019, Tennessee enacted a criminal abortion ban whose enforcement would be triggered by a U.S. Supreme Court judgment overturning *Roe v. Wade*, 410 U.S. 113 (1973). Tenn. Code Ann. § 39-15-213. On June 24, 2024, the U.S. Supreme Court issued such a judgment in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and overruled nearly fifty years of precedent affirming a right to end a pregnancy. On August 25, 2022, Tennessee began

---

[22] About one-third of minors who did not inform their parent(s) about their abortion had suffered family violence and chose not to inform their parent(s) out of fear that the violence would recur. Stanley K. Henshaw et. al., *Parental Involvement in Minors' Abortion Decisions*, Family Planning Perspectives 24(5): 196-207, 213 (1992). A study on judicial bypass seekers in Texas identified common reasons why some minors choose not to disclose their abortion to their parents, included fear of being ostracized or "kicked out" of the family home, substance abuse issues within the family, and fear of harming familial relationships. Kate Coleman-Minehan, R.N., F.N.P.-B.C., Ph.D, et. al., *Young Women's Experiences Obtaining Judicial Bypass for Abortion in Texas*, Journal of Adolescent Health (July 18, 2018).

[23] Paige Phleger, *For Years, Teens Came to Nashville to Ask for a Judge's Permission to Get Abortions Instead of Telling Their Parents. That's Done, Leaving 'Zero Options.,'* WPLN NEWS (2022), https://wpln.org/post/for-years-teens-came-to-nashville-to-ask-for-a-judges-permission-to-get-abortions-instead-of-telling-their-parents-thats-done-leaving-zero-options/ (last visited Jun 21, 2024).

[24] *Id.*

enforcing its "trigger ban," which originally lacked any exceptions and offered only an affirmative defense to physicians able to prove that they provided the abortion because it was necessary to avoid the patient's death or a "serious risk of substantial and irreversible impairment of a major bodily function." Tenn. Code Ann. § 38-15-213, subdiv. (c)(1)(A). In 2023, Tennessee replaced this affirmative defense with a vague and exceedingly narrow exception: if a physician determines, "using reasonable medical judgment, based upon the facts known to the physician at the time," that an abortion is necessary to avoid the patient's death, or there is a "serious risk of substantial and irreversible impairment of a major bodily function." *Id.* at § 38-15-213(c).

67.     Even in this exceedingly narrow circumstance, Tennessee continues to require written, parental consent before a young person can obtain an abortion. *Id.* § 37-10-303. Yet, it has eliminated the possibility of judicially bypassing the requirement.[25]

68.     An intended and horrifying consequence of Tennessee's criminal abortion ban is that many Tennessee residents who do not want to remain pregnant, including young people, must travel out of state for abortion care. Indeed, in the year after the ban took effect, the number of abortions provided in the state plummeted from about 1,200 each month to fewer than ten.[26] This means that more than 14,000 Tennesseans, of whom almost 1,000 were young people, could no

---

[25] Paige Pfleger, *Tennessee teens can no longer seek judicial bypass for abortions*, NPR (Sept. 9, 2022, 4:53 PM), https://www.npr.org/2022/09/09/1122123601/tennessee-teens-can-no-longer-seek-judicial-bypass-for-abortions#:~:text=Hourly%20News-,Tennessee%20teens%20can%20no%20longer%20seek%20judicial%20bypass%20for%20abortions,about%20what%20options%20are%20left.

[26] Society of Family Planning, *#WeCount Report*, Society of Family Planning (Oct. 24, 2023), at 11, https://societyfp.org/wp-content/uploads/2023/10/WeCountReport_10.16.23.pdf.

longer obtain abortion care from in-state providers.[27] Only two other states in the nation experienced a greater drop in abortion care following the *Dobbs* decision.[28]

69.     Having to travel out of state for an abortion is generally more complicated, more expensive, more time-consuming, and more distressing than obtaining an abortion in one's home state.

70.     As discussed below, Plaintiffs are intimately aware of the burdens that out-of-state travel imposes on Tennesseans, and especially young people, because they work tirelessly to anticipate, identify, and alleviate those burdens.

71.     Tennessee minors need to know where they can obtain care given their unique circumstances, including their gestational age, health profile, and the funds they can cobble together for the cost of the care.

72.     They need to know the most efficient way to get to their abortion appointment since many lack a driver's license and common carriers bar them from purchasing tickets on their own.[29]

---

[27] Katherine Kortsmit, PhD et. al., *MMWR Surveillance Summaries*, Vol. 72, No. 9, CENT. DIS. CONTROL PREV. (November 24, 2023), at 15, https://www.cdc.gov/mmwr/volumes/72/ss/pdfs/ss7209a1-H.pdf.

[28] Society of Family Planning, *WeCount Report: April 2022 to December 2023*, Society of Family Planning (May 14, 2024), at 18, https://societyfp.org/wp-content/uploads/2024/05/WeCount-report-6-May-2024-Dec-2023-data_Final.pdf.

[29] Greyhound prohibits anyone under the age of 16 from purchasing tickets, and prohibits traveling without a parent, guardian, or passenger over the age of 16. Greyhound Lines, Inc., *Children Traveling*, GREYHOUND, https://www.greyhound.com/children-traveling (last visited June 20, 2024). Amtrak bars young people from purchasing tickets online, and instead requires them to call its phone-booking service to ensure they abide by its Unaccompanied Minors Policy. Amtrak, *Unaccompanied Minors Policy*, AMTRAK, https://www.amtrak.com/unaccompanied-minors-policy#:~:text=Children%20age%2012%20and%20under,the%20Amtrak%20Unaccompanied%20Minor%20Policy (last visited June 20, 2024). Megabus bars anyone under age 17 from riding its buses unaccompanied by an adult. Megabus, *Can minors ride Megabus unattended?*, https://us.megabus.com/help (last visited June 20, 2024).

73.     Relatedly, young people in Tennessee, most of whom lack a meaningful income, need transportation to their abortion appointments or funding covering transportation.

74.     The need to leave the state for an abortion also makes it more likely that young people in Tennessee will need lodging or funding covering lodging to legally end their pregnancies. As with common carriers, Airbnb and many hotels will not sell accommodations to a young person without an adult's involvement.[30]

75.     And the longer someone seeking an abortion is away from home, the more meals they will need away from home—for which young people in particular lack funds–and the longer they will need childcare. About one in ten of the young people that MAC serves need childcare. More often, young people are caretakers for younger people in their family, such as siblings.

76.     Just as before Tennessee's abortion ban took effect, these needs are especially acute among young people belonging to communities of color, rural communities, and LGBTQ+ communities.

77.     MAC estimates that young people in Tennessee seeking an abortion out of state spend an average of five days with the organization developing a detailed plan for the journey and need an average of $400 to execute that plan. The complex arrangements and fundraising needed for a young person to obtain an abortion outside of Tennessee, which on average takes over a week,

---

[30] Airbnb prohibits people under the age of 19 to create an Airbnb account, host a listing, or make a reservation. Airbnb, *Who can have an Airbnb account*, https://www.airbnb.com/help/article/3047#:~:text=Underage%20users%3A%20People%20under%20the,be%20accompanied%20by%20an%20adult.. To stay at an Airbnb, travelers must be accompanied by an adult. *Id*. Marriot has a minimum age of 18 to book a stay at their hotels, and Best Western, Wyndham, Radisson, and Hyatt all have a minimum booking age of 21. Andrea Bennet, *How old do you have to be to book a hotel room? The guide you need*, KAYAK (Nov. 3, 2023), https://www.kayak.com/news/how_old_to_book_a_hotel_room/#:~:text=Best%20Western%2C%20Wyndham%2C%20Radisson%2C,front%20desk)%20before%20you%20book.

often require young people in Tennessee to re-schedule their abortion appointments and obtain the care later in their pregnancy. The fact that young people tend to learn they are pregnant at later gestational ages than adults only exacerbates these delays.

78.     Importantly, the need to flee Tennessee for legal abortion care makes many young people feel like criminals. This is particularly true for young people who belong to populations that are over-criminalized, including communities of color and poor communities. Likewise, having to leave the state adds untold stress and anxiety to the experience of obtaining an abortion as the young person contends with the prospect of having to carry their pregnancy to term and parent a child against their will.

79.     Thus, young people in Tennessee rely heavily on Plaintiffs and other helpers to obtain legal abortion care.

### III.   Plaintiffs Support Young People in Tennessee Seeking Legal Abortion Care in Solidarity with Young People and in Defiance of Efforts to Isolate and Degrade Them.

80.     Plaintiffs are organizations with long histories of serving as helpers and trusted adults for young people who become pregnant.

81.     "Helpers" are the people who assist others in realizing their rights.

82.     When helpers extend a hand, they do more than provide aid, however; they send a message. To those who are persecuted, they send a message of respect and solidarity: that the persecuted person's humanity is bound up in that of the helpers', that their dignity is connected, that their rights are one and the same, and that the helper is working toward achieving collective liberation.

83.     To the persecutors, helpers send a message of protest and defiance: that the persecutors' attempts to isolate, stigmatize, and degrade others will not stand.

84.     This is true whether the aid furthers a politically popular viewpoint or a minority one.

85.     It is especially true when the state disagrees with the message, values, or goals of the aid provided.

86.     Trusted adults are those in a community with whom young people can be and feel safe. They are people young people can turn to in times of concern, hardship, or crisis.

87.     Plaintiffs associate with pregnant young people in Tennessee as a show of respect and solidarity, communicating the messages that neither pregnancy nor their status as minors strips them of their inherent dignity as decision-makers and that the young people are not alone. Plaintiffs express the message that there is, indeed, someone willing to truly listen to them as they consider whether to continue their pregnancy and help them realize this momentous decision.

88.     Plaintiffs also associate with pregnant young people in Tennessee as a show of protest and defiance, communicating the messages that continued pregnancy, childbirth, parenthood, or adoption must be as freely chosen as the pregnant person's circumstances allow. Plaintiffs express the message that choosing not to continue a pregnancy is a valid, deeply personal choice that should remain out of politicians' hands.

89.     Plaintiffs work, not only with pregnant young people in Tennessee, but also with other helpers to disseminate these messages, including reproductive justice organizations, abortion funds, practical support organizations, clinicians, and donors.

90.     Plaintiff SisterReach, for example, provides two key services to young people in Tennessee seeking legal abortion care to stand in solidarity with them, communicate the

importance of not imposing one's moral code on others, and resist politicians' efforts to do exactly that to the detriment of the health and wellness of the communities SisterReach serves.[31]

91.     SisterReach sometimes provides these services at the request of a clergy member calling on behalf of a young person in their congregation. At other times, it does so at the request of a young person's parent.

92.     But SisterReach never requires that callers disclose their age, and thus does not require a young person to involve a parent or guardian in their decision to seek a legal abortion.

93.     First, SisterReach provides accurate and complete information about a young person's lawful options for ending their pregnancy, which almost always involves abortion care in other states. SisterReach also refers young people to abortion providers based on their location and gestational age.

94.     Second, SisterReach provides funding to defray the cost of young people's legal abortions. A young person is then free to use the funding they would have used to cover their abortion to pay for transportation, lodging, food, and childcare.

95.     By paying for young people's legal abortion care regardless of the level of parental involvement, SisterReach honors their capacity to make decisions about the meaning of life and whether to bring life into this world. It reaches a hand out to young people and lets them know they are not alone and that they deserve to live in abundance.

96.     Plaintiff Midwest Access Coalition provides three key services to pregnant young people in Tennessee, both to express respect for and solidarity with them, and to communicate protest and defiance of attempts to brand abortion patients as shameful.

---

[31] SisterReach also provides resources to Tennesseans, including young people, who continue their pregnancies, such as diapers, food, clothing, and toiletries.

97. MAC sometimes provides these services in close consultation with the young person's parent or primary caretaker, who sometimes accompanies the young person to their abortion appointment.

98. But MAC does not ask callers their age, and thus does not require young people to involve a parent or guardian in their decision to seek a legal abortion.

99. First, MAC gives young people in Tennessee accurate and complete information about their lawful options for resolving their pregnancy, such as legal abortion care in other states. MAC also refers young people to clinicians, including abortion providers, consistent with young people's considered decisions. In providing these services, MAC shows that young people deserve to make informed choices about their bodies and lives, and to have those choices honored.

100. Second, MAC helps pregnant young people in Tennessee navigate the logistics of traveling to an out-of-state abortion provider by helping them develop a detailed plan. In some cases, an adult accompanying the young person has seldom left the state. Thus, these plans cover everything from how to maneuver air travel to places where the young person and her companion can find nutritious, affordable food once they arrive at their destination. MAC also talks young people in Tennessee through challenges as they arise during the trip. In working closely with young people in this way, MAC communicates that, as human beings, they are entitled not simply to choose whether to remain pregnant, give birth, or parent a child, but also to have a comfortable and private abortion experience if they choose to reject or delay those things.

101. Third, MAC funds the travel, lodging, meals, and childcare that young people in Tennessee need to obtain legal abortions out of state. This includes booking and/or paying for: gasoline, flights, commuter trains, ride shares, hotels, and babysitters. Occasionally, MAC also physically transports young people from Tennessee to out-of-state abortion appointments.

102.    While MAC does not pay for the abortion themselves, it does connect young people in Tennessee with sources of funding for abortion care, and often secures the funds on behalf of the young people from multiple sources.

103.    By providing practical support to pregnant young people who reside in Tennessee, MAC stands with them, affirms they are capable decision-makers, and expresses resistance to politicians' attempts to impose pregnancy, childbirth, or parenthood on them.

### IV.    SB 1971 Makes it a Crime to Support Young People in Tennessee Seeking Legal Abortion Care.

104.    On May 28, 2024, Governor Bill Lee signed SB 1971 into law.

105.    SB 1971 creates the criminal offense of "abortion trafficking of a minor." S.B. 1971(1)(a) (Tn. 2023).

106.    The statute provides that "abortion trafficking" occurs when any adult "recruits, harbors, or transports a pregnant unemancipated minor within [Tennessee]" without the *written, notarized consent* of the minor's parent or guardian for the purpose of:

- "Concealing an act that would constitute a criminal abortion under § 39-15-213 from the parents or guardian of the pregnant unemancipated minor";

- "Procuring an act that would constitute a criminal abortion under § 39-15-213 for the pregnant unemancipated minor, *regardless of where the abortion is to be procured*"; or

- "Obtaining an abortion-inducing drug for the pregnant unemancipated minor for the purpose of an act that would constitute a criminal abortion under § 39-15-213, *regardless of where the abortion-inducing drug is obtained.*"

*Id.* § 1(a).

31

107.    SB 1971 fails to define its key terms or phrases, including "recruiting" "harboring" "transporting," "concealing," or "within Tennessee."

108.    The legislative process leading up to the passage of SB 1971 demonstrates that lawmakers passed the statute knowing that it offered little guidance as to what conduct it criminalizes.

109.    When fellow legislators raised concerns during committee hearings and floor discussions about the then-bill's ambiguity, including the meaning of "recruit," "harbor," or "transport," bill sponsors Senator Paul Rose and Representative Jason Zachary demurred that the courts would have to decide the issue.[32] At other times, the sponsors admitted that "'to recruit' could include just about anything," and Representative Zachary characterized "help[ing] any young person travel out of state if they need[] an abortion" as "recruitment."[33]

110.    As Senator Jeff Yarbo summarized, SB 1971 "uses language that we don't know what it means. We do not know what we are outlawing here . . . We are just creating a mess. And we are creating a mess around conversations and interstate travel."[34]

---

[32] *See* Senate Session, 61st Legislative Day (April 10, 2024, 10:03 AM) https://wapp.capitol.tn.gov/apps/videowrapper/default.aspx?CommID=601000; Video: House Population Health Subcommittee Hearing,(February 13, 2024, 2:05 PM) https://wapp.capitol.tn.gov/apps/videowrapper/default.aspx?CommID=801000; House Health Committee Hearing, (February 21, 2024 11:09 AM) https://wapp.capitol.tn.gov/apps/videowrapper/default.aspx?CommID=801000. Rep. Zachary also deferred some questions regarding statutory definitions to a legislative attorney, who similarly stated that the court would have to resolve questions about the bill's reach.

[33] *Id*. at 0:13:17 (statement by Rep. Jason Zachary); *Id*. at 0:13:58 (statement by Rep. Jason Zachary).

[34] *See* Senate Session,61st Legislative Day (April 10, 2024, 2:30 PM) https://wapp.capitol.tn.gov/apps/videowrapper/default.aspx?CommID=601000.

111.    Notably, it is not clear that an abortion needs to occur for a helper to violate SB 1971—the statutory language may be construed to criminalize acting with the intent to help someone obtain an abortion.

112.    SB 1971 "does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care" so long as the diagnosis or consultation excludes "performing or attempting to perform an abortion . . . or arranging for travel . . . to procure an abortion or abortion-inducing drug." [35] *Id.* § 1(f).

113.    SB 1971 makes "abortion trafficking" a Class A misdemeanor, punishable by imprisonment for eleven months and twenty-nine days. *Id.* § 1(b).

114.    SB 1971 also authorizes a young person's parent or legal guardian to bring a wrongful death suit against anyone who violates the statute. S.B. 1971(e) (Tn. 2023). In this case, the plaintiff may recover economic damages, noneconomic damages, punitive damages, and attorney fees and costs. *Id.* § 1(e). The statute does not require a defendant to be criminally charged for a civil suit to be brought against them. *Id.*

115.    Without this Court's intervention, SB 1971 will take effect on July 1, 2024.

**V.      SB 1971 Would Severely Harm Plaintiffs and Young People in Tennessee Seeking Legal Abortion Care.**

116.    If SB 1971 takes effect, it will confuse some young people in Tennessee into thinking that it is illegal for them to obtain an abortion in another state even if the abortion is legal

---

[35] There is also an exemption for "common carrier[s] transporting passengers in the course and scope of their business" and "ambulance driver[s] or operator[s] and any corresponding emergency medical services personnel . . . acting within the course and scope of their duties." S.B. 1971(c), Gen. Assemb., Sec. Reg. Sess. (Tn. 2023).

there. Consequently, SB 1971 will chill some young people in Tennessee from ever contacting Plaintiffs or other helpers for information, referrals, logistical, financial, or practical support.

117.    Further, SB 1971 does not allow Plaintiffs or other helpers to determine which of their services to young people in Tennessee who lack written, notarized parental consent constitute criminal "recruiting," "harboring," "transporting," or "concealing."

118.    Consider the following scenario. A young person in Tennessee expresses that she does not want to be pregnant, in part because her mother would throw her out of their home if she learned of the pregnancy. A SisterReach employee provides the young person with comprehensive information about an abortion provider in a state where there are no parental involvement requirements. Does this constitute "recruiting" under SB 1971?

119.    Similarly, does it constitute "harboring" under SB 1971 for a young person's aunt to allow her niece to spend a night in her Nashville home before the niece's flight to Washington, D.C., where the young person intends to obtain an abortion without her parents knowing?

120.    And is a MAC employee "transporting" a young person under SB 1971 when they disburse funds for an Uber to drive the young person from Tennessee to another state without knowing whether the young person's parent consents to that service?

121.    Lastly, does the "concealing" that SB 1971 criminalizes include a MAC employee disbursing funds to a Tennessee hotel so that a young person can recuperate after obtaining an abortion in another state without disclosing the procedure to her family?

122.    As these scenarios illustrate, the law is hopelessly vague. Consequently, it will have a significant chilling effect on helpers who face criminal liability. Plaintiffs plan to cease providing services to young people in Tennessee so long as SB 1971 can be enforced against them, especially in light of its criminal penalties. S.B. 1971(c) (Tn. 2023).

123.    SB 1971 would also, therefore, force Plaintiffs and other helpers to turn away any young person in Tennessee who cannot involve a parent in their abortion decision or has good reasons not to. These reasons include not knowing whether or where the young person's parents are living; having parents who are incarcerated or battling substance abuse issues that prevent them from adequately caring for their children; having abusive[36] or neglectful parents, including parents who would throw the young person out for becoming pregnant; living in foster care;[37] or living in juvenile detention.

124.    SB 1971 would also force Plaintiffs and other helpers to turn away young people in Tennessee whose parents have consented to their seeking a legal abortion in another state, but who cannot secure written, notarized parental consent for all the support they need to obtain that abortion. Some parents lack state-issued identification, cannot visit a notary on short notice, or lack the technology needed to use a virtual notary.[38]

125.    In these ways, SB 1971 chills

126.    By depriving young people in Tennessee of helpers' emotional support, SB 1971 would exacerbate the fear and anxiety that they suffer trying to end a pregnancy in another state.

---

[36] The legislature's indifference towards young people living with abuse or incest is evident from its rejection of a proposed amendment that would have exempted young people from SB 1971 whose pregnancy was caused by rape or incest by a parent. Am. 9 to H.B. 1895, Gen. Asemb., Sec. Reg. Sess. (tn. 2023).

[37] For every 1,000 children under the age of eighteen in Tennessee, six live in foster care. Center for American Progress, Poverty in the United States: Explore the Map (last visited March 6, 2024), https://www.americanprogress.org/data-view/poverty-data/poverty-data-map-tool/.

[38] Efforts to comply with the written notarization requirement may substantially delay a young person's abortion care, and not only require them to live with an unwanted pregnancy for longer, but also increase the costs and health risks of the abortion.

Isolating young people in Tennessee in this way would also exacerbate the sensation of feeling like a criminal for traveling out of state for legal healthcare.

127.    Moreover, without the guidance of Plaintiffs and other helpers, some young people in Tennessee may spend an inordinate amount of time identifying where they can get a legal abortion and securing an abortion appointment. This would push their abortions to even later gestational ages than usual, and not only require them to live with an unwanted pregnancy for longer, but also increase the costs and health risks of the abortion.

128.    Even if they are able to cover the costs of obtaining an abortion out of state, they may have to divert funds from necessities such as food.

129.    Further, the logistical, financial and practical barriers to obtaining a legal abortion out of state may be insurmountable for some young people in Tennessee in the wake of the gap left by Plaintiffs and other helpers. This is particularly true for young people who lack the support and guidance of a parent or trusted adult. A young person in foster care, for example, typically has no recourse other than a helper for securing the money needed for an abortion procedure. It is also particularly true for young people who belong to communities of color, rural communities, and LGBTQ+ communities.

130.    In these ways, SB 1971 would compel some young people in Tennessee to carry a pregnancy to term. Carrying a pregnancy to term against one's will can be traumatic even without serious complications during the pregnancy, labor, delivery, or postpartum period, especially as a young person. And it can require a young person to make agonizing decisions about whether or how to parent a child in challenging circumstances.

131.    SB 1971 would also compel some young people in Tennessee to try to end their pregnancies themselves, which carries legal risks, particularly for young people belonging to communities of color.[39]

132.    By forcing Plaintiffs to turn away young people in Tennessee for lack of written, notarized parental consent, SB 1971 would both stifle and subvert the messages they express through their services. That is, rather than express respect for and solidarity with young people or communicate protest and defiance of political schemes to deprive young people of legal abortion access, SB 1971 would require them to reject and distance themselves from some young people, and to twist their operations to comply with legislation that would prevent some young people from obtaining legal abortions.

## CLAIMS

## COUNT 1

### Vagueness

133.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 132.

---

[39] Between 2000-2020, almost 45% of those criminalized for self-managed abortion or assisting another with an abortion were people of color. Laura Huss, et. al., *Self-Care, Criminalized: August 2022 Preliminary Findings*, If/When/How (2022), https://ifwhenhow.org/wp-content/uploads/2023/06/22_08_SMA-Criminalization-Research-Preliminary-Release-Findings-Brief_FINAL.pdf. Since *Dobbs*, there have been multiple cases of criminalizing people of color for miscarriages and abortion care. *See* Claretta Bellamy, *Black woman charged after miscarrying in bathroom shares feelings about arrest*, NBC News (Jan. 26, 2024 at 1:49 PM), https://www.nbcnews.com/news/nbcblk/brittany-watts-miscarriage-bathroom-charged-rcna135861; Anna Betts, *Woman Who Was Charged With Murder After Abortion Sues Texas Prosecutor*, New York Times (Mar. 30, 2024), https://www.nytimes.com/2024/03/30/us/texas-abortion-murder-charge-lawsuit.html.

134.    SB 1971 is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment because it: a) fails to provide fair notice of the conduct it prohibits, and b) is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement of the statute.

## COUNT 2

### Free Expression

135.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 134.

136.    SB 1971 criminalizes or chills the provision of information about and referrals for legal abortion care by Plaintiffs and other helpers.

137.    SB 1971 violates the First Amendment because it is a content- and viewpoint-based restriction on protected speech that fails the applicable level of constitutional scrutiny.

138.    SB 1971 criminalizes or chills logistical, financial and practical support by Plaintiffs and other helpers that is intended to convey, and understood by others to communicate, certain messages.

139.    SB 1971 violates the First Amendment because it is a content- and viewpoint-based restriction on expressive conduct that fails heightened scrutiny.

140.    SB 1971 is overbroad because a substantial number of its applications are unconstitutional, as compared with its constitutional applications.

## COUNT 3

### Expressive Association

141.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 140.

142.    SB 1971 criminalizes or chills Plaintiffs' association with certain young people, reproductive justice organizations, abortion funds, practical support organizations, clinicians, and donors, which Plaintiffs undertake to express certain messages.

143.    SB 1971 violates the First Amendment because it restricts expressive association and fails the applicable level of constitutional scrutiny.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A) Enter a declaratory judgment that SB 1971 is unconstitutionally vague and therefore unenforceable;

B) Enter a declaratory judgment that SB 1971 violates the First Amendment and is therefore unenforceable;

C) Temporarily restrain or preliminarily enjoin Defendants, and their employees, agents, and successors in office from enforcing SB 1971 on its face and/or in any circumstances in which its enforcement would be unconstitutional;

D) Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing SB 1971 on its face and/or in any circumstances in which its enforcement would be unconstitutional;

E) Grant reasonable attorney's fees and costs; and

F) Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated:  June 27, 2024

Respectfully submitted,

*/s/ Melissa J. Stewart*
Melissa J. Stewart, TN #40638
Bryce W. Ashby, TN #26179
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
Phone: (901) 209-5500
Fax: (901) 278-3111
melissa@donatilaw.com
byrce@donatilaw.com

Rupali Sharma, ME #6192*
LAWYERING PROJECT
443 Western Ave., No. 1025
South Portland, ME 04106
Phone: (646) 490-1219
Fax: (646) 480-4622
rsharma@lawyeringproject.org

Jamila Johnson, LA #37953**
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 706-4981
Fax: (646) 480-8622
jjohnson@lawyeringproject.org

Juanluis Rodriguez, NY #5543194**
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1080
Fax: (646) 480-4622
prodriguez@lawyeringproject.org

*Application for admission pending
**Motion for admission *pro hac vice*
forthcoming

*Attorneys for Plaintiffs*